



**U.S. Department of Justice**

Federal Bureau of Investigation

*Washington, D.C. 20535*

July 7, 2004

PERSONAL

Mr. Daniel Foster
Federal Bureau of Investigation
Miami, Florida

Dear Mr. Foster:

This letter is to advise you that I have completed my review of three administrative inquiries concerning allegations that you: 1) had an inappropriate relationship with a member of the criminal element who was an FBI cooperating witness (CW); 2) misused your position by obtaining drinks free of charge from a strip club/bar which was operated by the CW; 3) were involved in investigative dereliction by improperly handling $119,660 cash evidence; 4) provided false, misleading, or erroneous information in an FD-302 dated October 5, 1999; 5) failed to document your interaction with the CW; 6) were involved in investigative dereliction by mishandling electronic surveillance (ELSUR) tapes; and 7) made false statements in a Signed Sworn Statement (SSS) you provided during an administrative inquiry conducted by the FBI/Office of Professional Responsibility (FBI/OPR) when you stated that a Supervisory Special Agent (SSA) who was your supervisor had ordered the destruction of drug evidence. Notice of the proposal to dismiss you from the rolls of the FBI was provided to you by letter, dated March 17, 2004. I find, based on a preponderance of the evidence, that the allegations against you have been substantiated. Therefore, I am dismissing you from the rolls of the FBI for the efficiency of the service, effective upon your receipt of this letter.

As the deciding official in this matter, I have given full and impartial consideration to all documentation and evidence upon which your proposed dismissal was based, your written response dated June 4, 2004, and your oral presentation on June 29, 2004. The basis for my decision is set forth below:

Mr. Daniel Foster

The allegations in this matter pertain to investigative activities conducted by Squad 5, a Drug Squad in the San Juan Division. You were assigned as an SA on the squad. In April 1998, Squad 5 opened an investigation addressing money laundering activities by drug dealers. The investigation became a Group I undercover operation (UCO) in approximately May/June 1998. Another Special Agent (SA #1) was the initial case Agent for the UCO; however, the entire squad participated in the investigation, along with members of a Joint Task Force (JTF) consisting of local and federal law enforcement personnel.

In October 1999, you became the case Agent for the UCO. The CW, who operated a strip club/bar, was suspected of being involved in money laundering and was under surveillance by Squad 5 and the JTF. On September 23, 1999, the CW was stopped in a ruse traffic stop near the Minillas Tunnel in San Juan while delivering a large sum of money to a source for the FBI. During the stop, you engaged the CW in conversation and convinced the CW to cooperate with the FBI. The CW subsequently participated with you in "money pick-ups" and "money transactions."

**<u>Inappropriate Relationship with a Criminal Element/CW</u>**

On two occasions in October 1999, you consumed alcoholic beverages and socialized with the CW's employees at the strip club/bar. On the first occasion, according to your February 1, 2002, SSS, the CW had phoned you and indicated he/she needed to see you at the strip club/bar. When you arrived at the strip club/bar, the CW had left. You remained at the strip club/bar and consumed several alcoholic beverages, with a bouncer and a dancer. While socializing at the strip club/bar, you posed as a Colombian businessman. You were not authorized to work in an undercover capacity; however, you stated you wanted to "cover" the CW as a source.

According to the dancer, the CW had asked her to sit with you because you had expressed an interest in meeting her. The CW offered you and the dancer a bottle of Viuda champagne which you drank together. When the dancer danced at the strip club/bar, she received a commission based on the number of bottles of champagne consumed. Several other employees of the strip club/bar believed that the dancer had performed semi-private dances for you; the dancer refuted this information. However, the dancer recalled that you provided her money (approximately $20) while she was dancing on the stage. In your February 1, 2002, SSS, you stated you did not have the dancer dance for you.

You stated that the following day, the CW phoned again and requested that you return to the strip club/bar. When you arrived there, the CW showed you a room and monitor on which the CW claimed to have captured you on tape. You got the impression that the CW believed he/she had somehow compromised you. The only discussion you had regarding the case was a comment by you to the effect, "let's talk," to which the CW replied that he/she was "trying really hard." At the conclusion of this conversation, you spoke to the dancer once more and asked her to dinner. You and the dancer left the strip club/bar and went to a restaurant for dinner. You denied that you consumed alcohol at the strip club/bar on this occasion.

2

Mr. Daniel Foster

In your written and oral responses, your attorney argued that you agreed to meet with the CW at the strip club/bar at the CW's request, because he/she was uneasy about meeting you at other locations where his/her identity as a CW could be compromised. You are not being disciplined for agreeing to meet the CW at the strip club/bar. You displayed your poor judgment when, after you learned the CW was not on the premises, you socialized and drank alcohol at the strip club/bar, where criminal activity was known to occur. For example, the CW's money laundering activities occurred at the strip club/bar. Furthermore, the strip club/bar was purported to employ exotic dancers who also engage in prostitution and operate out of the establishment. Your conduct created an appearance problem and put you in a position where you could have been compromised. Your conduct is aggravated because the CW was an FBI source.

Your conduct was a violation of the following Bureau policy:

The Manual of Administrative Operations and Procedures (MAOP), Part I, Section 1-1, which states, in part:

> ". . . employees shall conduct themselves in a manner that creates and maintains respect for the Department of Justice and the U.S. government. In all their activities, personal and official, they should always be mindful of the high standards of behavior expected of them."

The MAOP, Part I, Section 1-1(8), which states, in part:

> ". . . [t]he Bureau expects its employees to so comport themselves that their activities both on and off duty will not discredit either themselves or the Bureau. Failure by an employee to follow these guidelines may result in appropriate disciplinary action . . ."

The MAOP, Part I, Section 1-1(9)(n), which states, in part:

> "Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or ethical standards..."

## Misuse of Position-Free Drinks

The CW's spouse, who handled the bookkeeping at the strip club/bar, provided a copy of a bar tab which contains the date "10/8." The bar tab contained a list of drinks without the prices listed, including a bottle of Viuda champagne. According to the spouse, the total for the drinks was approximately $250, with the bottle of champagne accounting for $175. The spouse had written "DANIEL FOSTER, FBI," on the tab because the CW had told him/her this was your tab. On the top of the tab is written, "[CW's first name] invitacion." The CW and his/her son alleged that you left the strip club/bar without paying this tab.

3

Mr. Daniel Foster

A bartender at the strip club/bar advised that he wrote "[CW's first name] invitacion," on the tab. He also wrote the drinks listed on the tab, which he stated showed the drinks which were consumed by a customer and the dancer. According to the bartender, the tab shows six Coors light beers, two esmeraldas, one B-52 (for the dancer), two gins (for the dancer), one Budweiser, and a Viuda champagne. The bartender advised that the drinks were $6 apiece, with the drinks for the dancer being $7 so she could receive a $1 commission. He also stated that the dancers received a $10-20 commission for drinking champagne with the customers.

The bartender stated that the notation "[CW's first name] invitacon," does not mean the customer does not have to pay for the drinks. He stated it meant that the customer would be reminded on his next visit that he had not paid. The bartender believed that the customer had left the strip club/bar without paying the tab because there is no tally by the drinks.

In your February 1, 2002 SSS, you recalled that on one occasion when you were ready to leave the strip club/bar, you attempted to pay your bill. You stated that the CW's son told you not to worry about the bill, that it was "their treat." You stated you left cash on the counter but the bartender did not want to accept it. You did not see the son ring you out on the cash register.

You claimed that you had not seen the bar tab with your name and "[CW's first name] invitaciones," written on it. You stated that the bill you were describing above had an itemization and the total amount written on it. You denied consuming the drinks listed on the "10/8," check and stated that you and the dancer did not consume champagne. However, several employees of the strip club/bar were certain that you maintained an open tab on the night in question, including the bouncer, the general manager, and the CW's son. Additionally, the bartender advised that there were indications that the bar tab in question was an open tab. Moreover, the dancer and the CW's son stated that you had champagne when you were drinking with the dancer. In addition to the CW, the CW's son and the general manager were aware that you were an FBI Agent.

In your written and oral responses, your attorney questioned the motives of the employees of the strip club/bar. While the motives of the CW and his/her family may be suspect, you have not presented credible evidence to refute the information provided by the remaining witnesses. Several of these individuals spoke positively of you, and one stated that he did not want to get you into trouble.

Based on the above, I find that a preponderance of the evidence establishes that you failed to pay for drinks at the strip club/bar, creating the impression that you misused your position to obtain free drinks.

Your conduct was in violation of the following Bureau policy which was previously described above: the MAOP, Part I, Section 1-1; the MAOP, Part I, Section 1-1(8); and the MAOP, Part I, Section 1-1(9)(n).

Mr. Daniel Foster

## Investigative Dereliction - Improper Handling of Cash Evidence

The SSA and other Squad 5 Agents outlined the procedures the squad followed for money laundering pickups involving a CW.  The procedures generally followed Bureau policy (with the exception that the squad did not count the money immediately, as required) and were as follows:  when a CW received money from a subject, the CW, subject, and pickup location were placed under surveillance to cover the meeting; after the CW received the money, he met with two Agents from the squad; the Agents would bring the money directly to the FBI office; the two Agents who took custody of the money photographed it in the SSA's office; the money was removed from the money container, but if it was received in bundles it remained in bundles; the money was placed into a canvass mailbag which tied at the top; the canvass mailbag was wrapped with nylon strapping tape and the Agents placed their initials on the nylon strapping tape, which sealed the container of money; two Agents would take the money to the valuable evidence vault where the money was placed in storage; on the next banking day, two Agents were assigned to remove the money from the valuable evidence vault and take it to a bank (still in the canvass mailbag) for an official money count; at the bank, bank employees unsealed the bag and counted it in the presence of the two Agents.  According to the SSA, the only variation from this policy occurred when an Evidence Control Technician (ECT) was not available.  On those occasions, the money was stored in a dual-combination safe for a short period of time, until an ECT was available.  The dual-combination safe required two combinations to be entered before it could be opened.  The SSA had one of those combinations and his two principal reliefs had the other.

You failed to follow the above described procedures when handling a money transaction involving the CW.  On the morning of October 5, 1999, the CW called you to advise that an individual associated with a Dominican drug dealer had brought money to the strip club/bar for the CW to hold.  Before you left for the strip club/bar, you informed the SSA of the situation.  The SSA was not pleased because there had been no surveillance of this transaction; however, since he did not want to leave the money with the CW, he instructed you to retrieve the money.  That afternoon, you and a JTF officer, a Sergeant with the Police of Puerto Rico, went to the strip club/bar to pick up the money.  No one, including the CW, counted the money at the strip club/bar.  According to you and the Sergeant, the CW had told you both that the amount of the money was approximately $120,000.

You and the Sergeant transported the money to the San Juan FBI Office where you arrived at approximately 3:00 p.m.  The money was photographed and then placed in a single-combination safe in the SSA's office where it was stored overnight.  The SSA was away from the San Juan Division on official business at this time; therefore, the dual-combination safe could not be opened.  You did not comment on the availability of an ECT.  The money was not counted before being placed in the safe.  There is no documentation showing who placed the money in the safe.  You stated that the next day, October 6, 1999, you took the money to the valuable evidence vault, without bundling or counting the money.  You stated that you placed the money in the vault in the original bundles that the CW provided.  You did not recall how you prepared the money, i.e., whether you put it in a box or a white canvass mailing bag.  This activity also was not documented, other than an entry on the access log for the valuable evidence vault which shows that you entered the vault at 5:10 p.m. for "storage."

5

Mr. Daniel Foster

According to you, on October 7, 1999, you took the money out of the vault and provided it to two Squad 5 SAs, names unrecalled, to take to a bank to be officially counted. The SAs brought the money back to the office and you placed it back in the vault. The SAs did not prepare an FD-302 regarding this activity. You stated that the Agents verbally told you the official count was $119,660. The evidence vault access log for that date indicates that you entered the vault at 11:10 a.m., with the reason stated as "remove box." You returned the box for "storage" at 3:55 p.m. No FD-302s or other documentation were prepared relative to this removal or official count, and no bank receipts were found in the file. An FD-302 prepared by you on October 31, 1999, referencing your investigation on October 5, 1999, was the first time a count was documented. However, the FD-302 does not state that the official count was obtained on October 7, 1999. Instead, the FD-302 leaves the impression that the count was made on October 5, 1999.

On October 16, 1999, you and a JTF officer removed the money from the valuable evidence vault to provide to the CW for use in a controlled delivery. There is no documentation of you removing the money from the vault, other than an entry on the vault access log showing you entered the vault at 9:45 a.m. for "review/safekeeping storage." Several ECTs who were interviewed stated that "review" means to take the money out of the valuable evidence vault. The plan was for the CW to deliver the money, which was contained in a shoulder bag, at the Diamond Palace Hotel, to money couriers sent by the Dominican drug dealer. According to the CW, you verbally told him/her there was $139,000 in the shoulder bag. On October 16, 1999, the CW arrived at the hotel with the money in the shoulder bag and went to a room with two female couriers. The CW was under surveillance by Squad 5 and JTF officers; however, surveillance of the CW was lost for approximately ten to fifteen minutes when he/she entered the lobby of the hotel and went to a room with the two female couriers. In the room, the two couriers counted the money using an adding machine. The adding machine tape was later found in the room indicating that the couriers had counted $118,660.

Shortly after the money was delivered, FBI SAs entered the room to arrest the couriers and seize the money. However, one of the couriers had escaped from the hotel with part of the money taken from the shoulder bag. This individual was eventually spotted and apprehended, and the money bag was seized by three SAs. Apparently, two of those SAs transported this portion of the money to the FBI office. The remaining money was seized in the hotel room. You transported the money seized at the hotel back to the FBI office, possibly with a JTF officer. The money was photographed at the office. You believed that the SA who was acting as relief supervisor on that day opened the single-combination safe in the SSA's office to place the money in the safe. Again, the SSA was away from the office. You did not recall placing the money in a white canvass mailbag. None of the participants recalled counting the money at that time. However, two FD-302s were prepared on October 17, 1999, apparently by an SA who was the San Juan asset forfeiture coordinator, stating that the money seized from the hotel room totaled $81,080, while the remaining portion of money totaled $38,080, for a grand total of $119,160. This administrative inquiry did not reveal how the asset forfeiture coordinator arrived at those amounts, since the money allegedly had not been counted after being seized. The money remained in the single-combination safe for over one week, until October 25, 1999, when an SA transported the money to a bank for an official count. You stated that you did not recall getting the money out of the single-combination safe for the SA. Additionally, you did not recall why

Mr. Daniel Foster

the money remained in the safe from October 16 to October 25. You stated that there was no urgency to obtain an official money count since the money was going to be seized and was not part of an ongoing money laundering transaction. The SA who transported the money to the bank prepared two FD-302s stating that the official count for the two portions of money were $81,080 and $38,080, for a total of $119,160. This amount is the same as the total in the FD-302s prepared on October 17, 1999, by the asset forfeiture coordinator, but is $500 less than the amount you asserted was the official count conducted on October 7, 1999.

In your SSS, you indicated that you were aware of the squad procedures for handling valuable evidence. However, you stated that you were not aware of Bureau rules concerning storage of valuable evidence (money) in single-combination safes. You also stated you were not aware of Bureau policy on storage of seized money.

Although I understand the complexity in handling drug and money laundering investigations, as case Agent you were responsible for all aspects of this investigation. A preponderance of the evidence establishes that you mishandled cash evidence when you failed to follow Bureau procedures regarding handling, documenting, counting, and storing the cash. As a result of your conduct, a $500 discrepancy between the amount reported as the official count in an October 5, 1999, FD-302 you prepared, and the official count documented in two FD-302s prepared by another SA on October 25, 1999, could not be explained.

Your conduct was a violation of the following Bureau policy:

The MAOP, Part II, Section 2-4.4.1(2), entitled, "Evidence," states, in pertinent part:

> "It is essential that seized/recovered/contributed property be properly identified and described by investigative personnel at the time possession is transferred to the investigator. The items are to be carefully packaged and the containers properly identified. If appropriate, chain of custody is to be established and a record thereof is to be maintained from the time possession transfers to the investigator to the time of trial/disposition. To minimize the number of FBI personnel required to establish chain of custody, it is recommended that one or two investigators be designated to identify and describe all evidence at any particular search or arrest site."

The MAOP, Part II, Section 2-4.4.8, entitled, "Valuable Evidence," states, in pertinent part:

> "(1) Valuable evidence is defined as money irrespective of amount and country of origin. . . ."

> "(3) Valuable evidence is to be independently counted/verified by two officials The sealing official is to be a federal criminal investigative agent or deputized officer; the witnessing official may include the ECT, the paralegal specialist, or other support employee directly involved in the processes of seizing, packaging,

Mr. Daniel Foster

and initial documentation of the evidence. They are to verify the accuracy of the count and/or detect any errors before the evidence is sealed and placed in storage."

> "(a) The valuable evidence is placed in an appropriate-sized plastic evidence pouch. The FBI evidence label, FD-723, is to be completed . . . ."

> "(b) The completed FBI evidence label (FD-723) is placed on the outside of the plastic evidence envelope, at the top, and folded at the perforation over both sides of the envelope. Insert the envelope into the heat sealer ensuring that the heat seal is made across the evidence label (FD-723)."

> "(d) Opening and resealing of valuable evidence must be conducted in the presence of:

1. Two federal criminal investigative agents/deputized officers, or

> 2. One federal criminal investigative agent/deputized officer and one witnessing official (as described in paragraph (3) above, or

> 3. Two paralegal specialists (one of which serves as a sealing official and one as a witnessing official)"

> "(e) The reasons and procedures must be fully documented in an FD-302 by the sealing and witnessing officials. . . ."

> "(4) Valuable evidence must be afforded maximum security while in the FBI's possession. . . ."

The MAOP, Part II, Section 2-4.4.9, entitled, "Temporary Storage - Drug and Valuable Evidence," states, in pertinent part:

> "(1) A security-type safe with a dual-combination locking system may be used for TEMPORARY STORAGE of drug and valuable evidence not to exceed ten (10) calendar days from date of acquisition. The secure container should be located either outside the ECR or in the Night Supervisor's working area. . .Evidence that is being temporarily stored within the container is to be properly heat-sealed and appropriate documentation is to be attached prior to its temporary storing."

> "(2) Neither the SAC's safe nor a squad supervisor's safe are to be used for the temporary storage of drug/valuable evidence. . . ."

Mr. Daniel Foster

### False, Misleading, or Erroneous Information - FD-302

On October 31, 1999, you transcribed an FD-302 documenting investigative activity on October 5, 1999. The FD-302 indicates that an individual had appeared at the CW's place of business on October 5, 1999 and handed him/her "the alleged amount of $120,000." The individual was under orders to give the money to the CW to pass to another unknown subject. You reported that you and the Sergeant went to the CW's business the same day, took possession of the money, and transferred it to the FBI office. The last paragraph of the FD-302 gives the impression that an official money count was conducted on October 5, 1999. The paragraph states:

> "The official money count was $119,660.00 and the money was then placed in the FBI , vault for safe keeping."

In your February 1, 2002, SSS, you stated that you reviewed the FD-302 typed on October 31, 1999. You stated that this FD-302 was for investigation on October 5, 1999. It should be noted that Bureau policy states that FD-302s should be prepared within five days. You stated there was a gap in the FD-302. According to you, the last paragraph should have read "On 10/7/99" in front of the paragraph. You stated that you wrote the FD-302 on October 31, 1999. You stated that it was your mistake in not placing a date wherein you indicated that the "official money count" was $119,660. You stated that you received this information verbally from the two unknown Agents who took the money to the bank for an official count. You now saw that this FD-302 gives the impression that you conducted an official money count on October 5, 1999.

You created the inaccurate impression that you and the Sergeant had conducted the official money count, by placing your names as the investigators on this FD-302. Both you and the Sergeant stated that you did not conduct the money count. According to your SSS, two unknown Agents took the money to the bank for the count. You stated that you included this information regarding the official money count in the FD-302 on behalf of the two Agents; however, the FD-302 does not state that two other Agents conducted the official money count. None of the Squad 5 Agents or JTF personnel who were interviewed recalled assisting you with this count.

In your written response, your attorney reiterated that you made an error in the FD-302 by failing to precede the last paragraph with the statement, "on 10/07/99." This argument is illogical in light of the events that took place between your seizure of the money on October 5, 1999, and the supposed official count on October 7, 1999. As has been previously discussed, the money was placed in your supervisor's safe when it was seized on October 5, 1999. The money was first taken to the vault on October 6, not October 7. You then removed and again returned the money on October 7. This activity was not documented in the FD-302.

Based on the foregoing, a preponderance of the evidence establishes that you provided false, misleading, or erroneous information on an FD-302 regarding the official count of the money obtained from the CW on October 5, 1999. In the FD-302, you gave the inaccurate

Mr. Daniel Foster

impression that an official money count was obtained on October 5, 1999, and that the money was placed in the vault at that time.

Your conduct was a violation of the following Bureau policy:

The MAOP, Part II, Section 10-1.11, states:

> "FD-302 and FD-302a are forms on which information is recorded that may later become testimony."

The MAOP, Part II, Section 10-13.3(11)(c), states:

> "When preparing a composite FD-302, set forth the dates of each interview session in the space provided on the first page of the FD-302 form. The preparation of the FD-302 should be effected within five days following the final interview session."

### Failure to Document Contact with the CW

According to the San Juan Division, the CW's file was opened on November 18, 1999, and closed on January 4, 2000. The file contains five FD-302s concerning contacts between you and the CW. Two FD-302s are dated September 23, 1999, one is dated October 5, 1999, and two are dated October 16, 1999. All the FD-302s are related to the money transaction between the CW and the Dominican money couriers. There were no other forms or serials relating to any other contact you had with the CW, including your contact at the strip club/bar. Additionally, you stated you had told the CW on October 7, 1999, that the official money count was $119,660. By your own admission, you also did not prepare an FD-302 regarding this contact.

In your written and oral responses, your attorney acknowledged that you did not document all your contacts with the CW. Your conduct was in violation of the following Bureau policy:

The Manual of Investigative Operations and Guidelines (MIOG), Part I, Section 137-4(5) (effective December 20, 1993), entitled "Operation of Informants" states:

> "All investigative activity must be made a matter of record in the field office files, including negative contacts, to ensure that the informant's files are accurate and complete."

The MIOG, Part I, Section 137-10(4)(d) (effective December 20, 1993), entitled "Informant Communications" states:

> "The FD-209 will be used to document all negative contacts with an informant relating to his/her investigative activities as an informant."

Mr. Daniel Foster

### <u>Investigative Dereliction - Mishandling ELSUR Tapes</u>

As was previously discussed, another SA (SA #1) was the original case Agent for the Group I UCO, which was a spin-off of an earlier money laundering investigation. During the earlier investigation, one of the subjects agreed to cooperate with the FBI, and was opened as a CW. SA #1 was the handling Agent for this CW. The information provided by the CW was the catalyst for the opening of the Group I UCO. The CW's cooperation included making consensual telephonic recordings. To facilitate the recording of phone calls, the CW was given two cell phones, owned and paid for by the FBI. One of the phones was a "clean" phone, to be used by the CW to call the Agents; the other "dirty" phone was to be used solely to talk to the money laundering subjects. Between December 1998 and October 1999, over 1,200 calls were consensually recorded over this cell phone.

Around October 1999, SA #1 transferred to FBIHQ. You became the case Agent for the Group I UCO and another SA (SA #2) became the co-case Agent, handling administrative matters. Additionally, SA #2 became the CW's handling Agent. During trial preparations in 2001, it was discovered that tapes of consensually recorded calls for the period April 30, 1998, through December 6, 1998, were missing. Most of the tapes were eventually found in the squad area; however, it was discovered that SA #1 had inadvertently taken 16 tapes with him when he transferred to FBIHQ in October 1999. When SA #1 discovered the tapes in late July 2000, he sent them to your supervisor, the SSA, in San Juan. The SSA instructed SA #2 to enter the tapes into ELSUR evidence; however, SA #2 placed the tapes in a filing cabinet in the squad area and never entered the tapes into evidence. In October 2000, SA #2 transferred to FBIHQ. Shortly before leaving San Juan, he advised the SSA that he had never entered the tapes into ELSUR. On the SSA's instructions, SA #2 gave the tapes to you.

In your November 18, 2002, SSS, you acknowledged receiving these tapes on October 13, 2000. According to you, SA #2 advised you that he had been unable to enter the evidence into ELSUR because SA #1 did not provide any documentation concerning the chain-of-custody. When you received the tapes, you placed them in a file cabinet in another squad area where other audio cassettes related to the Group I UCO were kept. You stated that you did not enter the tapes into ELSUR evidence because SA #1 had not provided the proper documentation for submission to ELSUR. You reiterated this argument in your written response. Regardless of SA #1's conduct, once the tapes were in your custody, you had a duty to ensure they were entered into evidence. You took no steps to ensure this was accomplished. The tapes were ultimately entered into evidence by another SA in January 2002, more than one year after they were turned over to you.

A preponderance of the evidence establishes that you mishandled original ELSUR tapes of consensual recordings made by a second CW when you failed to maintain appropriate custody and control of the tapes. Your conduct was a violation of the following Bureau policy:

The MIOG, Part II, Section 10-9.8.2(3) and, entitled, "Removable Recording Media," states, in pertinent part:

Mr. Daniel Foster

> "(a)  All recording media. . .are subject to the evidentiary rules and procedures identified in this manual and other Department of Justice instructions and policy directives."

> "(b)  Removable recording media created as ORIGINAL EVIDENCE are subject to evidentiary Chain-of-Custody rules and will be labeled, maintained as evidence, transferred, and stored as instructed in MIOG, Part 2, 10-9.8 through 10-9.8.2."

The  MIOG, Part II, Section 10-9.8, entitled, "Preservation of Original Tape Recordings," states, in pertinent part:

> "All original criminal ELSUR media recordings will be placed in an FD-504a or FD-504b (Chain of Custody - ELSUR Evidence Envelope), sealed and retained in a modified steel wardrobe-type cabinet, security approved container, or metal file cabinet equipped with a bar-lock device, hasp or other security-approved lock, unless, under Title III, the authorizing judge has directed to the contrary.  These cabinets are to be housed in a limited or restricted access location under the custody and control of the ELSUR Operations Technician to ensure against unauthorized access in order to overcome any claim that the ELSUR media was altered or distorted while in the possession of the FBI and to assure the chain of custody. . . ."

The MIOG, Part II, Section 10-9.8.1, entitled, "FD-504a or FD-504b (Chain of Custody - ELSUR Evidence Envelope)," states, in pertinent part:

> "(1)  All original medium (i.e., analog audio and video cassettes, compact disks, and digital audio and video storage medium regardless of format), will be placed in an FD-504a or FD-504b envelope, maintained as evidence and stored as instructed above in Section 10-9.8 of the manual."

> "(a)  Recordings made under the direction of the FBI, pursuant to Consent. . . ."

> "(f)  Temporary Storage:  If at any time during the course of the evidence-handling process, the Agent, EOT, or other person in possession of the FD-504a or FD-504b envelope will be delayed in carrying out an activity, he or she should promptly release custody of the envelope by placing the envelope containing digital body recorder, the computer disk, or other removable media into a secure temporary storage container or facility, and note release to "temporary storage" on the envelope.  The placement of the envelope should be recorded on the FD-455 (Access Log) attached to the storage container or facility designated for this purpose."

The MIOG, Part II, Section 10-9, entitled, "ELECTRONIC SURVEILLANCE (ELSUR) PROCEDURES AND REQUIREMENTS," states, in pertinent part:

Mr. Daniel Foster

> "(1) Electronic surveillance is one of the most effective and valuable investigative techniques utilized in both criminal and national security investigative matters. To protect the use of this technique, the administrative and management controls contained in this section will receive the same meticulous oversight as does the informant program. Unless otherwise noted, it will be the responsibility of the case Agent and his/her supervisor to ensure compliance with these instructions. . . ."

The Field Guide for Undercover and Sensitive Operations (Revised September 1, 1995), Section 15, entitled, "Consensual Monitoring in Undercover Operations," states, in pertinent part:

> "15.3 Custody and Control
>
> 'The custody and control of consensual recordings can be as significant an issue as whether a conversation was recorded. Recording a conversation is of no value if the recording is lost or it is ordered suppressed because the chain of custody is broken and/or the government is unable to demonstrate that the recording has not been tampered with or altered. It is a fundamental principle that confusion or delay in the handling of recordings significantly undermines the usefulness of the recording as an investigative and prosecutive tool. . . ."

## False Statements (Lying) Under Oath

In your February 1, 2002, SSS to the FBI/OPR, you stated that during the Manillas Tunnel stop of the CW, a small amount of white powder was found in the CW's trunk. You later learned this was a small amount of cocaine. You stated that the cocaine was not placed into evidence and suggested that your supervisor, the SSA, ordered the cocaine to be destroyed. In the paragraph in question, you stated:

> ". . .This white powder was not placed into evidence. SSA [name deleted] and task force agent SA [name deleted], INS, had discussed this issue. SA [name deleted] indicated that since [the CW] was a resident alien, even if [he/she] was going to be a source, if [he/she] was charged with possession of narcotics, [he/she] would ultimately be deported by INS. SSA [name deleted] made a decision to discard the white powder which I understood to be cocaine from conversations from the Squad 5 area. I believe that it was flushed down a toilet. Concerning the small amount of white powder obtained from [the CW] during the car stop, other agents handled that transaction. I recall that SSA [name deleted] and SA [name deleted], INS, discussed this matter. I believe that other Squad 5 agents tested the white powder and determined it to be cocaine before it was flushed down the toilet. . . In my review of the [Group I UCO] case, I have not seen any documentation related to the disposal of the white powder."

As a result of your statement, the DOJ/OIG opened an inquiry regarding the possible destruction of drug evidence by the SSA. On April 18, 2002, the DOJ/OIG interviewed you as a complainant. In that interview, you indicated that you never intended to make allegations against

Mr. Daniel Foster

the SSA. When asked to explain your statement in the FBI/OPR inquiry, you stated that the SSA never told anyone to throw away the drug evidence seized from the CW. You stated that you made an assumption that the drug evidence may have been handled inappropriately because during your review of the Group I UCO file in 2002, you could not find paperwork showing the cocaine had been placed into evidence. You stated that someone on Squad 5 had "suggested" to you that the drug evidence may have been improperly disposed of or "flushed."

Based on your recantation of your statements regarding the SSA and the destruction of the cocaine, the DOJ/OIG conducted an administrative inquiry in which you were the subject. You were interviewed and provided a SSS in the form of an affidavit on August 13, 2002. The affidavit incorporated three pages of a statement you had prepared yourself.

You provided several explanations regarding your February 1, 2002, SSS. First, you indicated that your statements in the February 1, 2002, SSS were taken out of context. You asserted that the statement "SSA [name deleted] made a decision to discard," referred to charges against the CW, not the cocaine. You stated the sentence should have read, "SSA [name deleted] then made a decision to discard (as in abandon) charging the subject with the possession of the white powder, which I understood to be cocaine from conversations in the Squad 5 area." You restated these arguments in your written and oral responses. However, your explanations are not credible for several reasons. For example, your use of the word discard applies more logically to throwing something away rather than failing to charge a subject with a crime. Additionally, the discussion immediately following this sentence pertains to what happened to the cocaine, not the CW. Furthermore, the two FBI SSAs who interviewed you during the FBI/OPR inquiry were certain that you were stating that the SSA had ordered the cocaine destroyed. The two SSAs provided copies of their interview notes which support their statements. Moreover, one of the SSAs provided the draft of your February 1, 2002, SSS, in which you made changes. Some of those changes were made in the relevant paragraph.

Additionally, in your August 13, 2002, interview and affidavit, you stated that you did not read your February 1, 2002, statement thoroughly before signing it because you were in a rush to catch a flight from San Juan to Miami later in the day. You also restated this assertion in your written and oral responses. However, you had been given ample time to make corrections to the statement. According to one of the interviewing SSAs, you were interviewed on January 29, 2002. On either January 30, 2002 or January 31, 2002, he presented you a typed draft of your sworn statement to review and make any desired revisions. You made several revisions to the draft, including several changes in the relevant paragraph. According to the interviewing SSA, one of the revisions consisted of you revising "flush the white powder," to "flushed the white powder." The SSA made your revisions and presented a second draft to you on February 1, 2002. According to the SSA, you made a few revisions on this statement as well. Upon correcting the second draft, the SSA printed out the final version which you swore to and signed, in the presence of the two interviewing SSAs. Both SSAs stated that although they were aware you had an afternoon flight, you did not appear to be rushed when you signed the sworn statement.

Mr. Daniel Foster

In your written and oral responses, you indicated that your discussion of the white powder, or cocaine, in your February 1, 2002, SSS, was only your speculation concerning its whereabouts, after the OPR investigators lead you to believe the cocaine was missing. You indicated that you based your speculation on an incident that occurred in the men's restroom of the federal building in San Juan, approximately three months after the Minillas Tunnel stop, which occurred in September 1999. You asserted that you overheard two unknown males discussing white powder which could have been flushed down the toilet. You concluded that the men were discussing the powder found during the stop of the CW. However, you had no explanation concerning the reason you linked this conversation between two unknown individuals, who apparently had no connection to the case, to the events in the Minillas Tunnel. You first mentioned this incident in your August 13, 2002, statement to the DOJ/OIG; however, you did not mention it in your February 1, 2002, SSS, or during your April 18, 2002, interview with the DOJ/OIG. In fact, during your April 18, 2002, interview, you told the DOJ/OIG investigators that "someone in Squad 5 suggested [to you] that they thought the drug evidence might have been improperly disposed of or 'flushed.'" You told the DOJ/OIG that you could not recall who the Squad 5 member was who gave you this information. You stated that this individual made the comments to you in late 2000 or early 2001. This information contradicts your most recent assertion that you learned of this issue three months after the September 1999 stop. Moreover, both SSAs who interviewed you for your February 1, 2002, SSS, were certain that you raised the issue of the cocaine at the time you were discussing the stop of the CW. Both SSAs also were certain that you stated that your SSA ordered the white powder to be destroyed. One of the SSAs recalled reviewing this portion of your SSS at least three times while interviewing you.

Based on the foregoing, a preponderance of the evidence establishes that you made false statements in your February 1, 2002, SSS to the FBI/OPR and in an August 13, 2002, affidavit to the Department of Justice/Office of the Inspector General (DOJ/OIG). These false statements constitute a lie under oath. Your conduct was a violation of the following Bureau policy:

The January 3, 1994, Airtel issued by the FBI Director to All SACs regarding the standards of conduct expected of all FBI employees. In that Airtel, the Director stated the following:

> ". . . I have determined that we have been too tolerant of certain types of behavior which are fundamentally inconsistent with continued FBI employment. I am, therefore, in this communication, drawing a 'bright line' which should serve to put all employees on notice of my expectations. . .

> ". . . I believe in the simple truth that lying, cheating, or stealing is wholly inconsistent with everything the FBI stands for and cannot

Mr. Daniel Foster

> be tolerated . . . I am setting forth the following examples of behavior, not meant
> to be all-inclusive, for which employees can expect to be dismissed:
>
> 1.) Lying under oath, e.g., during an administrative inquiry;

All the charges against you are serious; however, I want you to understand clearly that
your lack of candor alone warrants your dismissal. I have considered your work record and lack
of prior disciplinary action. However, the honesty of FBI SAs is vital to maintaining the integrity
of the FBI as the premier law enforcement agency. Moreover, you were warned during this
administrative inquiry that if you failed to reply truthfully, you could expect to be dismissed from
the rolls of the FBI. As a result, I am dismissing you from the rolls of the FBI, effective upon
your receipt of this letter. This action is necessary and warranted to promote the efficiency of the
FBI.

## APPEAL RIGHTS

Should you desire to appeal this action, you may address your written response stating the
grounds on which you base your appeal to the Assistant Director (AD), Administrative Services
Division (ASD), Room 6012, U. S. Department of Justice, Federal Bureau of Investigation, J.
Edgar Hoover Building, 935 Pennsylvania Avenue, Northwest, Washington, D.C. 20535-0001.
Any appeal must be filed within ten calendar days following notification of the disciplinary
action. *The discipline imposed by this letter is **not** postponed pending your appeal.*

Upon receipt of an appeal of a suspension of fourteen calendar days or less or a probation
action, the AD or Deputy AD, ASD, will personally review and decide the appeal. Upon receipt
of an appeal of a suspension more than fourteen calendar days, dismissal, or demotion, the AD,
ASD, will establish a Disciplinary Review Board (DRB) to review the action taken by the OPR.
In exercising appellate authority, ASD and a DRB may independently redetermine the factual
findings and/or the penalty imposed. Should you wish to employ an attorney to assist you in this
appeal, you must ensure that the enclosed forms on the disclosure of FBI information be
completed prior to any disclosure of Bureau information to the attorney handling your appeal. If
you and the attorney who will assist you on appeal have earlier completed and provided these
forms to the Bureau in connection with this case, these forms do not need to be reaccomplished.
You are referred to the Director's Memorandum to all SACs dated March 5, 1997, for additional
details pertaining to appeals.

## REFERRAL TO OTHER DIVISIONS

In accordance with established policy, the results of this communication will be
shared with other divisions as appropriate. This administrative inquiry is being provided to the
Security Division as it may be relevant to an employee's retention of a Top Secret security
clearance.

Mr. Daniel Foster

## NOTICE TO SEPARATED EMPLOYEE REGARDING
## FEDERAL EMPLOYEES HEALTH BENEFITS COVERAGE

Under authority of 5 U.S.C. 8905a and 5 C.F.R. 890.1112, the Bureau has determined that this separation is for "gross misconduct" as defined by 5 C.F.R. 890.1102. This means that you will not be allowed to enroll for continued Federal Employees Health Benefits coverage after you leave the Bureau through the Temporary Continuation of Coverage provisions. You may appeal this determination to the Personnel Officer, ASD, FBI Headquarters, Room 6012, and a final decision on this matter will be issued in writing. If upheld by the Bureau, the finding of "gross misconduct" may then be appealed only through suit in United States District Court.

Sincerely yours,

Daniel R. Dzwilewski
Acting Assistant Director
Office of Professional Responsibility

Enclosures

17